# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $250,000.00 | 12-13-2019 | 12-13-2024 | 5552562 | 08 | 45-4759306 | *** | |
| References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations. | | | | | | | |

**Borrower:** True Colours, Inc. ([redacted])
502 S Main St
Stillwater, OK 74074

**Lender:** First National Bank & Trust Co of Weatherford
STILLWATER WEST BRANCH
4611 W 6TH AVE
STILLWATER, OK 74074
(405) 533-3737

**Principal Amount: $250,000.00** **Date of Note: December 13, 2019**

**PROMISE TO PAY.** True Colours, Inc. ("Borrower") promises to pay to First National Bank & Trust Co of Weatherford ("Lender"), or order, in lawful money of the United States of America, the principal amount of Two Hundred Fifty Thousand & 00/100 Dollars ($250,000.00), together with interest on the unpaid principal balance from December 13, 2019, calculated as described in the "INTEREST CALCULATION METHOD" paragraph using an interest rate of 6.750% per annum based on a year of 360 days, until paid in full. The interest rate may change under the terms and conditions of the "INTEREST AFTER DEFAULT" section.

**PAYMENT.** Borrower will pay this loan in full immediately upon Lender's demand. If no demand is made, Borrower will pay this loan in 59 payments of $4,814.14 each payment and an irregular last payment estimated at $4,813.81. Borrower's first payment is due January 13, 2020, and all subsequent payments are due on the same day of each month after that. Borrower's final payment will be due on December 13, 2024, and will be for all principal and all accrued interest not yet paid. Payments include principal and interest. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method.

**PREPAYMENT; MINIMUM INTEREST CHARGE.** In any event, even upon full prepayment of this Note, Borrower understands that Lender is entitled to a minimum interest charge of $7.50. Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: FIRST NATIONAL BANK & TRUST COMPANY OF WEATHERFORD, STILLWATER WEST BRANCH, 4611 W 6TH AVE STILLWATER, OK 73061.

**LATE CHARGE.** If a payment is 11 days or more late, Borrower will be charged 5.000% of the unpaid portion of the regularly scheduled payment or $9,999.99, whichever is less. The late charge will not be less than $5.00. However, Lender may charge the maximum delinquency charge authorized by law as it may be increased during the term of this loan.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased to 18.000% per annum based on a year of 360 days. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Change In Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including without limitation all attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Oklahoma without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Oklahoma.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instrument listed herein:

(A) a Commercial Security Agreement dated December 13, 2019 made and executed between True Colours, Inc. and Lender on collateral described as: inventory, accounts, equipment and general intangibles.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: First National Bank & Trust Co of Weatherford, STILLWATER WEST

EXHIBIT A

**Loan No: 5552562**

**PROMISSORY NOTE**
**(Continued)**

Page 2

BRANCH, 4611 W 6TH AVE, STILLWATER, OK 74074.

**GENERAL PROVISIONS.** This Note is payable on demand. The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Note on its demand. If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE. BORROWER AGREES TO THE TERMS OF THE NOTE.**

**BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.**

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

**BORROWER:**

**TRUE COLOURS, INC.**

By: _____
Brian Matthew  Hobbs, President of True Colours,
Inc.

LaserPro, Ver. 19.2.0.042  Copr. Finastra USA Corporation 1997, 2019.  All Rights Reserved.  - OK  L:\PROSUITE\CFNLPL\D20\.FC  TR-5917  PR-COMM SEC

# PROMISSORY NOTE

| Principal $100,000.00 | Loan Date 12-13-2019 | Maturity 12-13-2020 | Loan No 5552563 | Call / Coll 08 | Account 45-4759306 | Officer *** | Initials |
|---|---|---|---|---|---|---|---|

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

Borrower:  True Colours, Inc. ███████
502 S Main St
Stillwater, OK 74074

Lender:  First National Bank & Trust Co of Weatherford
STILLWATER WEST BRANCH
4611 W 6TH AVE
STILLWATER, OK 74074
(405) 533-3737

---

**Principal Amount: $100,000.00**                                        **Date of Note: December 13, 2019**

**PROMISE TO PAY.** True Colours, Inc. ("Borrower") promises to pay to First National Bank & Trust Co of Weatherford ("Lender"), or order, in lawful money of the United States of America, the principal amount of One Hundred Thousand & 00/100 Dollars ($100,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.** Borrower will pay this loan in full immediately upon Lender's demand. If no demand is made, Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on December 13, 2020. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning January 13, 2020, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the "NEW YORK PRIME RATE" AS PUBLISHED IN THE MONEY RATES SECTION OF THE WALL STREET JOURNAL (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 4.750% per annum. Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 1.000 percentage point over the Index, resulting in an initial rate of 5.750% per annum based on a year of 360 days. NOTICE: Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method.

**PREPAYMENT; MINIMUM INTEREST CHARGE.** In any event, even upon full prepayment of this Note, Borrower understands that Lender is entitled to a minimum interest charge of $7.50. Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to:  FIRST NATIONAL BANK & TRUST COMPANY OF WEATHERFORD, STILLWATER WEST BRANCH, 4611 W 6TH AVE STILLWATER, OK  73061.

**LATE CHARGE.** If a payment is 11 days or more late, Borrower will be charged 5.000% of the unpaid portion of the regularly scheduled payment or $9,999.99, whichever is less. The late charge will not be less than $5.00. However, Lender may charge the maximum delinquency charge authorized by law as it may be increased by law under the term of this loan.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased to 18.000% per annum based on a year of 360 days. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including without limitation all attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Oklahoma without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Oklahoma.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instrument listed herein:

EXHIBIT A

**PROMISSORY NOTE**

Loan No: 5552563

**(Continued)**

Page 2

(A) a Commercial Security Agreement dated December 13, 2019 made and executed between True Colours, Inc. and Lender on collateral described as: inventory, accounts, equipment and general intangibles.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: **Brian Matthew Hobbs, President of True Colours, Inc.** Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print outs.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: First National Bank & Trust Co of Weatherford, STILLWATER WEST BRANCH, 4611 W 6TH AVE, STILLWATER, OK 74074.

**GENERAL PROVISIONS.** This Note is payable on demand. The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Note on its demand. If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.**

**BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.**

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

BORROWER:

TRUE COLOURS, INC.

By: _____
Brian Matthew Hobbs, President of True Colours, Inc.

# COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $250,000.00 | 12-13-2019 | 12-13-2024 | 5552562 | 08 | 45-4759306 | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Grantor:** True Colours, Inc. ([redacted])
502 S Main St
Stillwater, OK 74074

**Lender:** First National Bank & Trust Co of Weatherford
STILLWATER WEST BRANCH
4611 W 6TH AVE
STILLWATER, OK 74074
(405) 533-3737

**THIS COMMERCIAL SECURITY AGREEMENT dated December 13, 2019, is made and executed between True Colours, Inc. ("Grantor") and First National Bank & Trust Co of Weatherford ("Lender").**

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

**All Inventory, Accounts, Equipment and General Intangibles**

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**FUTURE ADVANCES.** In addition to the Note, this Agreement secures all future advances made by Lender to Grantor regardless of whether the advances are made a) pursuant to a commitment or b) for the same purposes.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.**

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management of the Corporation Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of Oklahoma, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to

EXHIBIT B

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

Loan No: 5552562

Page 2

be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral if the estimated cost of repair or replacement exceeds $$$250.00, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute lien entry forms and documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note or at the highest rate authorized by law, from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default. If Lender is required by law to give Grantor notice before or after Lender makes an expenditure, Grantor agrees that notice sent by regular mail at least five (5) days before the expenditure is made or notice delivered two (2) days before the expenditure is made is sufficient, and that notice within sixty (60) days after the expenditure is made is reasonable.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Grantor's existence as a going business, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Oklahoma Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise dispose of the Collateral. Unless the Collateral in whole or in part is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or of the time after which any private sale or other disposition is to be made. Notwithstanding any other provision of this Agreement, any requirement of notice for this purpose shall be met if notice is provided at least ten (10) days before sale or other disposition or action. Lender shall be entitled to, and Grantor shall be liable for, all reasonable costs and expenditures incurred in realizing on Lender's security interest, including without limitation, all court costs, fees for sale, selling costs and reasonable attorneys' fees as set forth in the Note or in this Agreement. All such costs shall be secured by the security interest in the Collateral covered by this Agreement.

**Appoint Receiver.** In any action by Lender for the foreclosure of this Agreement, whether by judicial foreclosure or power of sale, Lender shall be entitled to the appointment of a receiver upon any failure of Grantor to comply with any term, obligation, covenant or condition contained in this Agreement, the Note, or any Related Documents.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. All prior and contemporaneous representations and discussions concerning such matters either are included in this document or do not constitute an aspect of the agreement of the parties. Except as may be specifically set forth in this Agreement, no conditions precedent or subsequent, of any kind whatsoever, exist with respect to Grantor's obligations under this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Oklahoma without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Oklahoma.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** To the extent permitted by applicable law, any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail, postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. To the extent permitted by applicable law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means True Colours, Inc. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means True Colours, Inc..

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision, together with all interest thereon and all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**Lender.** The word "Lender" means First National Bank & Trust Co of Weatherford, its successors and assigns.

**Note.** The word "Note" means the Note dated December 13, 2019 and executed by True Colours, Inc. in the principal amount of $250,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED DECEMBER 13, 2019.**

**Loan No: 5552562**

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Page 5

GRANTOR:

TRUE COLOURS, INC.

By: _____
Brian Matthew Hobbs, President of True Colours,
Inc.

LaserPro, Ver. 19.2.0.042  Copr. Finastra USA Corporation 1997, 2019.  All Rights Reserved.  - OK  L:\PROSUITE\CFI\LPL\E40.FC  TR-2547  PR-COMM SEC

# COMMERCIAL SECURITY AGREEMENT

| Principal $100,000.00 | Loan Date 12-13-2019 | Maturity 12-13-2020 | Loan No 5552563 | Call / Coll 08 | Account 45-4759306 | Officer *** | Initials |
|---|---|---|---|---|---|---|---|

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

Grantor:  True Colours, Inc.
502 S Main St
Stillwater, OK 74074

Lender:  First National Bank & Trust Co of Weatherford
STILLWATER WEST BRANCH
4611 W 6TH AVE
STILLWATER, OK 74074
(405) 533-3737

THIS COMMERCIAL SECURITY AGREEMENT dated December 13, 2019, is made and executed between True Colours, Inc. ("Grantor") and First National Bank & Trust Co of Weatherford ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

All Inventory, Accounts, Equipment and General Intangibles

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A)  All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B)  All products and produce of any of the property described in this Collateral section.

(C)  All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D)  All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E)  All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, owed to Lender, whether or of a like nature to the Note Indebtedness or not, whether arising from a loan or a purchased obligation, whether incurred for a consumer or a business purpose, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**FUTURE ADVANCES.** In addition to the Note, this Agreement secures all future advances made by Lender to Grantor regardless of whether the advances are made a pursuant to a commitment or b) for the same purposes.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management of the Corporation Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of Inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of Oklahoma, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell Inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to

EXHIBIT B

**COMMERCIAL SECURITY AGREEMENT**
**(Continued)**

be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral if the estimated cost of repair or replacement exceeds $$$250.00, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute lien entry forms and documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or

Loan No: 5552563
# COMMERCIAL SECURITY AGREEMENT
## (Continued)

Page 3

paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note or at the highest rate authorized by law, from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default. If Lender is required by law to give Grantor notice before or after Lender makes an expenditure, Grantor agrees that notice sent by regular mail at least five (5) days before the expenditure is made or notice delivered two (2) days before the expenditure is made is sufficient, and that notice within sixty (60) days after the expenditure is made is reasonable.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Grantor's existence as a going business, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Oklahoma Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise dispose of the Collateral. Unless the Collateral in whole or in part is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or of the time after which any private sale or other disposition is to be made. Notwithstanding any other provision of this Agreement, any requirement of notice for this purpose shall be met if notice is provided at least ten (10) days before sale or other disposition or action. Lender shall be entitled to, and Grantor shall be liable for, all reasonable costs and expenditures incurred in realizing on Lender's security interest, including without limitation, all court costs, fees for sale, selling costs and reasonable attorneys' fees as set forth in the Note or in this Agreement. All such costs shall be secured by the security interest in the Collateral covered by this Agreement.

**Appoint Receiver.** In any action by Lender for the foreclosure of this Agreement, whether by judicial foreclosure or power of sale, Lender shall be entitled to the appointment of a receiver upon any failure of Grantor to comply with any term, obligation, covenant or condition contained in this Agreement, the Note, or any Related Documents.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. All prior and contemporaneous representations and discussions concerning such matters either are included in this document or do not constitute an aspect of the agreement of the parties. Except as may be specifically set forth in this Agreement, no conditions precedent or subsequent, of any kind whatsoever, exist with respect to Grantor's obligations under this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**COMMERCIAL SECURITY AGREEMENT**

| Loan No: 5552563 | (Continued) | Page 4 |
|---|---|---|

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Oklahoma without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Oklahoma.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** To the extent permitted by applicable law, any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. To the extent permitted by applicable law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means True Colours, Inc. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means True Colours, Inc..

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision, together with all interest thereon and all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**Lender.** The word "Lender" means First National Bank & Trust Co of Weatherford, its successors and assigns.

**Note.** The word "Note" means the Note dated December 13, 2019 and executed by True Colours, Inc. in the principal amount of $100,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED DECEMBER 13, 2019.**

Loan No: 5552563 **COMMERCIAL SECURITY AGREEMENT**
(Continued)

Page 5

GRANTOR:

TRUE COLOURS, INC.

By: _____
Brian Matthew  Hobbs, President of True Colours,
Inc.

LaserPro, Ver. 19.2.0.044, Copr. Finastra USA Corporation 1997, 2019.  All Rights Reserved.    GA - L:\PROSUITE\CFI\LPL\E40.FC  TR-2038  PR-COMM SEC

# COMMERCIAL GUARANTY

| | | | |
|---|---|---|---|
| **Borrower:** | True Colours, Inc.<br>502 S Main St<br>Stillwater, OK 74074 | **Lender:** | First National Bank & Trust Co of Weatherford<br>STILLWATER WEST BRANCH<br>4611 W 6TH AVE<br>STILLWATER, OK 74074<br>(405) 533-3737 |
| **Guarantor:** | Brian Matthew Hobbs (SSN: 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)<br>6 CHAMPIONS PLACE<br>STILLWATER, OK 74074 | | |

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY.** THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time: (A)  prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose;  (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness (H) to assign or transfer this Guaranty in whole or in part; (I) to exercise or refrain from exercising any rights against Borrower or others, or otherwise act or refrain from acting; (J) to settle or compromise any Indebtedness; and (K) to subordinate the payment of all or any part of any Indebtedness of Borrower to Lender for the payment of any liabilities which may be due Lender or others.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that  (A)  no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty;  (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein;  (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G)  no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I)  Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J)  Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition.  Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S FINANCIAL STATEMENTS.** Guarantor agrees to furnish Lender with the following:

**Annual Statements.** As soon as available, but in no event later than thirty (30) days after the end of each fiscal year, Guarantor's balance sheet and income statement for the year ended, prepared by Guarantor in form satisfactory to Lender.

**Tax Returns.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Guarantor's Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

All financial reports required to be provided under this Guaranty shall be prepared in accordance with GAAP, applied on a consistent basis, and

EXHIBIT C

**COMMERCIAL GUARANTY**

**(Continued)**

certified by Guarantor as being true and correct.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness; or (G) by any failure, neglect, or omission by Lender to perfect in any manner the collection of the Indebtedness or the security given therefor, including the failure or omission to seek a deficiency judgment against Borrower. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty.

**Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. All prior and contemporaneous representations and discussions concerning such matters either are included in this document or do not constitute an aspect of the agreement of the parties. Except as may be specifically set forth in this Guaranty, no conditions precedent or subsequent, of any kind whatsoever, exist with respect to Guarantor's obligations under this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Governing Law.** This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Oklahoma without regard to its conflicts of law provisions.

**Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Notices.** To the extent permitted by applicable law, any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. To the extent permitted by applicable law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other

Loan No: 5552563

# COMMERCIAL GUARANTY
## (Continued)

Page 3

right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means True Colours, Inc. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Guarantor.** The word "Guarantor" means everyone signing this Guaranty, including without limitation Brian Matthew Hobbs, and in each case, any signer's successors and assigns.

**Guaranty.** The word "Guaranty" means this guaranty from Guarantor to Lender.

**Indebtedness.** The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**Lender.** The word "Lender" means First National Bank & Trust Co of Weatherford, its successors and assigns.

**Note.** The word "Note" means and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED DECEMBER 13, 2019.

GUARANTOR:

X _____
Brian Matthew Hobbs

---

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF  Oklahoma          )
                            ) SS
          Payne   COUNTY    )

Before me, the undersigned, a Notary Public in and for this State, on this  13th  day of  December  20 19 , personally appeared Brian Matthew Hobbs, to me known to be the identical person(s) who executed the within and foregoing Guaranty, and acknowledged to me that he or she executed the same as his or her free and voluntary act and deed for the uses and purposes therein set forth.

Signed the  13th  day of  December , 20 19         _____
                                                   Notary Public  Christopher Harris

My Commission Expires  12/1/20

EXHIBIT ___ D

# Personal Financial Statement

As of _____

**Simmons Bank**

INDIVIDUAL 1

IF STATEMENT IS JOINT PLEASE COMPLETE THE FOLLOWING:
INDIVIDUAL 2

| INDIVIDUAL 1 | | INDIVIDUAL 2 | |
|---|---|---|---|
| Name: | MARK SARNO | Name: | BRIAN HOBBS |
| Address: | 6 CHAMPION PL | Address: | |
| City: | STILLWATER State: OK Zip: 74074 | City: | State: Zip: |
| Home Phone: | 973·452·6512  Work Phone: | Home Phone: | 973·452·6519  Work Phone: |
| Social Security Number: | 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 | Social Security Number: 443·78·4519 | 405·372·2772 |
| Date of Birth: | 12/31/59 | Date of Birth: | 12/17/79 |
| Current Employer: | Yrs. | Current Employer: | GARDEN PARTY FLORIST Yrs. 5 |
| Position or Occupation: | | Position or Occupation: | OWNER |

NOTE: If there is a joint party to this financial statement who is either borrowing or guaranteeing the credit under consideration, the columns titled "Solely Owned-Individual 2" and "Solely... Individual 2" must be completed.

| ASSETS | | SOLELY OWNED | | JOINTLY OWNED |
|---|---|---|---|---|
| | | INDIVIDUAL 1 | INDIVIDUAL 2 | |
| Cash | (Schedule A) | 350,000 | 50,000 | 71,400 |
| Cash Value Life Insurance | (Schedule B) | | 9,000 | |
| Government & Readily Marketable Securities | (Schedule C) | 79,000 | | |
| Notes & Accounts Receivable | (Schedule D) | | 100,000 | |
| Non-marketable Securities | (Schedule E) | | | |
| Personal Residence(s) | (Schedule F) | | | 500,000 |
| Other Real Estate | (Schedule F) | 450,000 | | 1,300,000 |
| Automobiles | | | | 154,000 |
| Other Personal Property  JEWELRY, ART | | 60,000 | 125,000 | 40,000 |
| IRAs, 401K & Other Qualified Plans | | | | |
| Other Assets | | | | |
| TOTAL ASSETS | | 939,000  $0 | 284,000  $0 | 2,065,400 $0 |

| LIABILITIES & NET WORTH | | SOLELY LIABLE | | JOINTLY LIABLE |
|---|---|---|---|---|
| | | INDIVIDUAL 1 | INDIVIDUAL 2 | |
| Notes Payable to Banks - Secured | (Schedule G) | | | |
| Notes Payable to Banks - Unsecured | (Schedule G) | | | |
| Notes Payable to Others - Secured | (Schedule G) | | | |
| Notes Payable to Others - Unsecured | (Schedule G) | | | |
| Margin Accounts | | | | |
| Accounts Payable (include Credit Cards) | | 9,000 | 7,000 | 54,000 |
| Real Estate Mortgages Payable | (Schedule F) | | | 875,000 |
| Taxes Payable | | | | |
| Loans on Life Insurance Policies | (Schedule B) | | | |
| Other Liabilities  AUTOS | | | | 92,000 |
| TOTAL LIABILITIES | | 9,000  $0 | 7,000  $0 | 1,021,000 $0 |
| NET WORTH (TOTAL ASSETS minus TOTAL LIABILITIES) | | 930,000  $0 | 277,000  $0 | 1,044,400 $0 |

| CONTINGENT LIABILITIES | | INDIVIDUAL 1 | INDIVIDUAL 2 | JOINT |
|---|---|---|---|---|
| As Guarantor or Endorser  SOFI; LENDING CLUB FOR MARKS → | | 23,000 | 325,000 | |
| On Leases or Contracts  AUSTIN | | 501,000 | | 35,000 |
| Tax Claims or Disputes | | | | |
| Letters of Credit | | | | |
| Future Capital Contributions | | | | |
| Other | | | | |
| TOTAL CONTINGENT LIABILITIES | | 23,000  $0 | 325,000 $0 | 35,000 $0 |

NOTE: Contingent Liabilities Schedule must be completed, if none, then write "None" on the schedule.

| SOURCES OF CASH INCOME (ANNUAL) | | | MONTHLY EXPENDITURES | | |
|---|---|---|---|---|---|
| For the Year Ended: | INDIVIDUAL 1 | INDIVIDUAL 2 | | INDIVIDUAL 1 | INDIVIDUAL 2 |
| Wages and Salaries | 24,000 | | Mortgage/Rent | | 3,000 |
| Bonuses, Commission, Etc. | | 55,000 | All Other Debt Service | | 7,000 |
| Interest and Dividends | | | Income Taxes | JOINT | |
| Rental Income (Net of Cash Expense) | | | Insurance | | |
| Partnership Draws, Distributions | 275,000 | 135,000 | Alimony | | |
| Other* | | | Child Support | | |
| | | | Other | | |
| TOTAL CASH INCOME | 299,000 | 190,000 $0 | TOTAL EXPENSES | $0  10,000 | $0 |

*Alimony, child support, or separate maintenance income need not be revealed if you do not wish to have it considered as a basis for obtaining credit.

Have you drawn a will? _NO_     Executor: _____

Are you a defendant in any suits or legal actions?
If yes, describe: _____ _NO_ _____

Have you ever filed a petition in bankruptcy or has one been filed individually against you? _NO_

Are you an executive officer, director, or principal shareholder of a bank? _NO_     Bank: _____

## INDICATE OWNERSHIP/LIABILITY BY CHECKING THE APPROPRIATE BOX IN EACH SCHEDULE.

### SCHEDULE A - CASH

| NAME & LOCATION OF INSTITUTION | ACCT. TYPE & NO. | BALANCE | OWNED BY | PLEDGE |
|---|---|---|---|---|
| OCEAN 1ST S&L BRICK NJ | CD'S | 150,000 | SPANO TRUST | — |
| HUDSON CITY S&L " " | " | 100,000 | " " | — |
| BANK SANTANDER " " | " | 100,000 | " " | — |
| KCB, Brick | | 71,400 | Brian + mark | |

### SCHEDULE B - LIFE INSURANCE [ NOTE: "O" in the "OWNED BY" column represents Other (e.g., Employer or Trust)]

| INSURANCE COMPANY | OWNED BY | BENEFICIARY | FACE VALUE | CASH VALUE | POLICY LOANS |
|---|---|---|---|---|---|
| LINCOLN FINANCL | BRIAN | MARK | 25,000 | 9,000 | — |

### SCHEDULE C - GOVERNMENT & READILY MARKETABLE SECURITIES

| FACE VALUE / NO. OF SHARES | OWNED BY | DESCRIPTION | COST | CURRENT MARKET PRICE |
|---|---|---|---|---|
| 1,000 | MARK | CHARLES SCHWAB | 50,000 | 79,000 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

### SCHEDULE D - NOTES & ACCOUNTS RECEIVABLE

| PAYMENTS DUE FROM | ORIGINAL BALANCE | CURRENT BALANCE | FREQUENCY OF PAYMENTS | PAYMENT AMOUNT | COLLATERAL |
|---|---|---|---|---|---|
| GARDEN PARK | 100,000 | 100,000 | NONE | NONE | NONE |

### SCHEDULE E - NON-MARKETABLE SECURITIES

| NUMBER OF SHARES OWNED | % OF TOTAL SHARES | OWNED BY | DESCRIPTION | VALUE |
|---|---|---|---|---|
| 100 | 100 | BRIAN | TRUE COLORS INT | 500,000 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

### SCHEDULE F - REAL ESTATE (If partially owned, give total property information, not your share.)

| DESCRIPTION | OWNED BY | OWNERSHIP % | DATE ACQUIRED | COST | VALUE | MORTGAGE BALANCE |
|---|---|---|---|---|---|---|
| 103 B ST. BRICK, NJ | SPANO TRUST | 100 | 1991 | 250,000 | 450,000 | 0 |
| CHAMPION STILLWATER OK | BRIAN + MARK | 100. | 2018 | 1,178,000 | 1,300,000 | 875,000 |

* See attached for additional information.

HAPPY HOLIDAYS

**From:** Brian Hobbs <brian@gardenpartyflowershop.com>
**Sent:** Friday, December 20, 2019 11:32 AM
**To:** Cecily N. Morris <cmorris@fnbwford.com>
**Subject:** Re: Thank you

hey Cecily

You are very welcome - those different colored poinsettias are so much more fun than the sameoldsameold red ones!

Thank you guys for the fancy tower of chocolate - I'm sharing (some) with my team today :-)

I was thinking through and if I could go ahead and draw down the remaining 25,000 on the line of credit that would be helpful - we are going to be out of town and the shop will be open/closed/open during that time, so it would be helpful to have some in the account in case i need to take care of anything while i'm gone and I wouldn't have to worry about catching on of you guys in the bank.  Let me know if I need to fill out another certificate - only thing's that's changed since last week is that I think a couple checks have come in...

Thanks - I'm really looking forward to starting to work with you guys in the New Year :-)
Brian

ps Mark gave me the pics of the mail receipts - thank you!!

On Dec 20, 2019, at 9:06 AM, Cecily N. Morris <cmorris@fnbwford.com> wrote:

Thank you SO much for the flowers!! They are beautiful!

**CECILY N MORRIS**
Branch Manager
First National Bank & Trust Company

4611 West 6th
Stillwater, OK 74074

Direct Line: 405-533-4478
Office: 405-533-3737

2

EXHIBIT  E

Fax: 405-533-3807
Email: cmorris@fnbwford.com

*This message is intended only for the use of the individual or entity
to which it is addressed and may contain information that is
privileged, confidential and exempt from disclosure under applicable
law. If the reader of this message is not the intended recipient, you
are hereby notified that any retention, dissemination, distribution, or
copying the communication is strictly prohibited. If you have received
this communication in error, please notify the sender immediately
and delete the email from your system.*

## Cecily N. Morris

| | |
|---|---|
| **From:** | Brian Hobbs <brian@gardenpartyflowershop.com> |
| **Sent:** | Monday, February 3, 2020 1:13 PM |
| **To:** | Cecily N. Morris |
| **Subject:** | Re: financial statement |

Hey Cecily - that sounds cool - can you go ahead and set it up for me?

brian

> On Jan 29, 2020, at 1:43 PM, Cecily N. Morris <cmorris@fnbwford.com> wrote:
>
> You will be approved for a certain amount of money. If a transaction comes through that would cause you to go negative, a sweep will be pulled over in $100 increments from the money line to cover the balance. You only pay interest on what you are using of it. If you pay it off and aren't using it, you won't be charged anything.
>
> For example, say you're approved for a $2,000 money line and a transaction comes through that would leave your checking account negative $648. $700 would pull over from the money line. You would only pay interest on the $700.
>
> **From:** Brian Hobbs <brian@gardenpartyflowershop.com>
> **Sent:** Wednesday, January 29, 2020 1:34 PM
> **To:** Cecily N. Morris <cmorris@fnbwford.com>
> **Subject:** Re: financial statement
>
> Thanks Cecily - That sounds like a good idea - especially as we are moving stuff there - how's it work?
> Brian

>> On Jan 29, 2020, at 10:36 AM, Cecily N. Morris <cmorris@fnbwford.com> wrote:
>>
>> Brian,
>>
>> Attached is your FS.
>>
>> Let me know if you're interested in setting up a Money Line for your account. (similar to bounce protection)
>>
>> **CECILY N MORRIS**
>> Branch Manager
>> First National Bank & Trust Company
>>
>> 4611 West 6th
>> Stillwater, OK 74074

EXHIBIT ___E___

1

Direct Line: 405-533-4478
Office: 405-533-3737
Fax: 405-533-3807
Email: cmorris@fnbwford.com

*This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any retention, dissemination, distribution, or copying the communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately and delete the email from your system.*

<Hobbs, Brian - PFS .pdf>

**Cecily N. Morris**

| | |
|---|---|
| **From:** | Cecily N. Morris |
| **Sent:** | Thursday, February 6, 2020 9:25 AM |
| **To:** | Brian Hobbs |
| **Subject:** | RE: Acct |

No problem Brian. The Money Line will go into effect at midnight tonight.

-----Original Message-----
From: Brian Hobbs <brian@gardenpartyflowershop.com>
Sent: Thursday, February 06, 2020 9:03 AM
To: Cecily N. Morris <cmorris@fnbwford.com>
Subject: Acct

ATTENTION: This email came from an external source. Do not open attachments or click on links from unknown senders or unexpected emails.

Hey Cecily - My cc deposit today is over 4,300, which covers our negative balance - I noticed the items paid today were paid with a NSF fee - is the Money Line not active yet? Promise to get this working more smoothly as we transition everything over to y'all.

Brian

1

## Cecily N. Morris

**From:** Cecily N. Morris
**Sent:** Thursday, February 6, 2020 9:25 AM
**To:** Brian Hobbs
**Subject:** RE: Acct

No problem Brian. The Money Line will go into effect at midnight tonight.

-----Original Message-----
From: Brian Hobbs <brian@gardenpartyflowershop.com>
Sent: Thursday, February 06, 2020 9:03 AM
To: Cecily N. Morris <cmorris@fnbwford.com>
Subject: Acct

ATTENTION: This email came from an external source. Do not open attachments or click on links from unknown senders or unexpected emails.

Hey Cecily - My cc deposit today is over 4,300, which covers our negative balance - I noticed the items paid today were paid with a NSF fee - is the Money Line not active yet? Promise to get this working more smoothly as we transition everything over to y'all.

Brian

EXHIBIT ___E___

 **National Bank & Trust Company**

## Credit Memorandum

| | |
|---|---|
| To: | Loan Committee |
| Officer: | Chris Harris |
| Prepared by: | Dusty Bradley |
| Date: | November 21, 2019 |
| Purpose of Request: | 1) $250,000 SBA Express (50% Guarantee) Installment Note to Refinance Business Debt |
| | 2) $100,000 SBA Express (50% Guarantee) RLOC for Operating Expenses |

| | | Credit Score | Date | Life Insurance | Assigned |
|---|---|---|---|---|---|
| Borrower(s): | True Colours, Inc | | | | |
| Guarantor(s): | Brian Hobbs | 676 | 11/25/2019 | | |
| | | | | | |

| Purpose of Loan | | Amount Requested |
|---|---|---|
| 1) SBA Express (50% Guarantee) Installment Note to Refinance RCB Note (Balance: $195,000) and Credit Cards: BoA ($17,150), Citibank ($10,733), Paypal ($6,016), Amex ($21,101) | $ | 250,000.00 |
| 2) SBA Express (50% Guarantee) RLOC for Operating Expenses | $ | 100,000.00 |
| Total Requested | $ | 350,000.00 |

| Collateral Description | Fair Market Value | Discounted Value | Source |
|---|---|---|---|
| A/R, Equipment, Office Equipment, Furniture, General Intangibles | $ 869,221 | $ 695,377 | A/R Report & Asset List 10/1/19 |
| Total Collateral Value | $ 869,221 | $ 695,377 | |
| Loan To Value Ratio | 44% | 55% | |

| Rate | Term | Amortization |
|---|---|---|
| 1) 5.75% | 5-year fixed rate term note | 5 Years |
| 2) 5.75% | Annual RLOC | 12 Months |

| DSCR | Debt/Asset |
|---|---|
| 1.97x | 44% |

**Comments:**
The beginning balance for the RLOC will be all fees and closing costs for the two loans.

**Loan Policy Exceptions:**
None

 EXHIBIT F

 **National Bank & Trust Company**

## Management Experience & Client History

**Management:**

| Name | Title | Function | % Owned | Years of Experience |
|------|-------|----------|---------|---------------------|
| Brian Hobbs | Owner | Manager | 100% | |
| | | | | |

**Existing Loans:**

| Borrower | Loan # | Original Amount | Balance | Rate | Collateral | Collateral Value |
|----------|--------|-----------------|---------|------|------------|------------------|
| N/A | | | | | | |

**Deposit Relationship:**

| Name on Acct | Acct # | Date Opened | Average Balance | Current Balance |
|--------------|--------|-------------|-----------------|-----------------|
| N/A | | | | |

**Comments:**

Brian Hobbs is the sole owner of True Colours, Inc, which operates as a retail florist shop under the name Garden Party Florist in Stillwater, OK. Brian is married to his husband, Mark Sarno. Mark gets the majority of his income through a trust fund. Brian and Mark are platinum-level donors to the OSU Foundation, donating $218,000 in FY19 (July 1, 2018-June 30, 2019). Their home mortgage is also through the OSU Foundation.



# *National Bank & Trust Company*

## **Balance Sheet Analysis**

**Financial Statement: True Colours, Inc.**

**Balance Sheet**

| Assets | 12/31/2016 | 12/31/2017 | 12/31/2018 | 3 Yr Avg |
|---|---|---|---|---|
| Cash | $ 10,362 | $ 35,695 | $ 18,129 | $ 21,395 |
| Accounts Receivable | $ 3,241 | $ 2,636 | $ 9,208 | $ 5,028 |
| Inventories | $ 77,420 | $ 73,228 | $ 78,667 | $ 76,438 |
| Other Current Assets | $ 13,370 | $ 7,192 | $ 5,622 | $ 8,728 |
| Buildings & Other Depreciable Assets | $ 342,769 | $ 707,692 | $ 560,004 | $ 536,822 |
| Less: Accumulated Depreciation | $ (190,592) | $ (469,736) | $ (418,135) | $ (359,488) |
| **Total Assets** | $ 256,570 | $ 356,707 | $ 253,495 | $ 288,924 |
| **Liabilities** | | | | |
| Other Current Liabilities | $ 4,114 | $ 5,177 | $ 3,487 | $ 4,259 |
| Notes Payable | $ 364,844 | $ 522,981 | $ 293,980 | $ 393,935 |
| **Liabilities** | $ 368,958 | $ 528,158 | $ 297,467 | $ 398,194 |
| **Net Worth/Capital** | $ (112,388) | $ (171,451) | $ (43,972) | $ (109,270) |
| **Debt to Asset Ratio** | 144% | 148% | 117% | 138% |
| +Accumulated Depreciation | $ 190,592 | $ 469,736 | $ 418,135 | $ 359,488 |
| Adj. Total Assets | $ 447,162 | $ 826,443 | $ 671,630 | $ 648,412 |
| Adj. Net Worth | $ 78,204 | $ 298,285 | $ 374,163 | $ 250,217 |
| Adj. Debt to Asset Ratio | 83% | 64% | 44% | 61% |

**Comments:**

True Colors balance sheet is pulled from their tax return Schedule L. At the end of 2019, they had $18,129 in cash, $9,208 in accounts receivable, and $78,667 in Inventories. Their total liabilities amounted to $297,467. Their adjusted net worth, after adding back depreciation, is $374,163 and their debt to asset ratio is 44%.

**Financial Statement: Brian Hobbs**

**Balance Sheet**

| Assets | 12/31/2017 |
|---|---|
| Cash | $ 121,400 |
| Cash Surrender Value of Life Insurance | $ 9,000 |
| Notes & Accounts Receivable | $ 100,000 |
| Ownership in True Colours, Inc | $ 500,000 |
| Personal Residence | $ 1,300,000 |
| Vehicles | $ 154,000 |
| Other Personal Assets | $ 165,000 |
| **Total Assets** | $ 2,349,400 |
| **Liabilities** | |
| Credit Cards Payable | $ 61,000 |
| Mortgages | $ 875,000 |
| Vehicles | $ 92,000 |
| **Liabilities** | $ 1,028,000 |
| **Net Worth/Capital** | $ 1,321,400 |
| **Debt to Asset Ratio** | 44% |

 **National Bank & Trust Company**

**Comments:**
Brian's net worth is $1,321,400 and his debt to asset ratio is 44%. Included in Brian's assets and liabilities are all assets and liabilities he shares with his husband Mark, including cash, non-marketable securities, their personal residence, vehicles, other personal property, and credit card, real estate, and vehicle debt.

## Income Analysis

**Cash Flow & Income Statement: True Colours, Inc.**

| Income Statement | 2017 TR | 2018 TR | 2019 P&L | 2 Yr Avg |
|---|---|---|---|---|
| Gross Sales | $ 568,077 | $ 511,214 | $ 544,659 | $ 539,646 |
| Cost of Goods Sold | $ 79,292 | $ 21,204 | $ 92,868 | $ 50,248 |
| Other Income | $ - | $ 4,597 | $ - | $ 2,299 |
| Gross Profit | $ 488,785 | $ 494,607 | $ 451,791 | $ 491,696 |
| Depreciation | $ 279,150 | $ 90,787 | $ - | $ 184,969 |
| Interest | $ 17,000 | $ 22,941 | $ 14,736 | $ 19,971 |
| Other G & A Expense | $ 320,233 | $ 78,895 | $ 224,998 | $ 199,564 |
| Net Profit | $ (127,598) | $ 301,984 | $ 212,057 | $ 87,193 |
| + Depreciation | $ 279,150 | $ 90,787 | $ - | $ 184,969 |
| +Interest | $ 17,000 | $ 22,941 | $ 14,736 | $ 19,971 |
| **Cash Flow Available for Debt Service** | $ 168,552 | $ 415,712 | $ 226,793 | $ 292,132 |
| | | | | |
| **Debt Service Requirements** | | | | |
| Proposed Loan 1 | | | $ 57,650 | |
| Proposed Loan 2 | | | $ 5,750 | |
| Credit Cards | | | $ 10,752 | |
| Automobiles | | | $ 40,920 | |
| | | | | |
| **Total Debt Service Required** | | | $ 115,072 | |
| **Excess Cash Flow** | | | $ 111,721 | |
| | | | | |
| **Debt Service Coverage Ratio** | | | 1.97 | |

**Comments:**
Brian's income comes from his Garden Party Florist shop in Stillwater, OK. The 2019 P&L is annualized from their 9-month P&L. Sales for 2019 are projected to be $544,659. The cash flow available for debt service is $226,793, and the total debt service is $115,072. The DSCR is 1.97x.

The cash flow does not include Mark's earnings, including those through his trust fund, which amounts to approximately $275,000/year. In 2018, Brian donated $55,338 to the OSU Foundation. Brian and his husband, Mark, are Platinum donors to the OSU Foundation. FY19 (July 1, 2018-June 30, 2019), they gave a combined $218,000 to the OSU Foundation.



# *National Bank & Trust Company*

---

## <u>Repayment Analysis</u>

<u>Primary Repayment:</u>
Primary repayment will come from the ordinary income of Brian's Garden Party florist shop in
Stillwater, OK. The 2019 P&L is annualized from their 9-month P&L. Sales for 2019 are
projected to be $544,659. The cash flow available for debt service is $226,793, and the total debt
service is $115,072. The DSCR is 1.97x.

<u>Secondary Repayment:</u>
Secondary repayment will come from the liquidation of collateral. Collateral includes all
accounts receivable, equipment, office equipment, furniture, and general intangibles. The total
collateral value is $869,221 and the LTV is 44%.

<u>Tertiary Repayment:</u>
Tertiary repayment will come from the liquidation of Brian Hobbs' personal assets. Brian's net
worth is $1,321,400 and his debt to asset ratio is 44%. Included in Brian's assets and liabilities
are all assets and liabilities he shares with his husband Mark, including cash, non-marketable
securities, their personal residence, vehicles, other personal property, and credit card, real estate,
and vehicle debt.

<u>Other Business to Pursue:</u>

<u>Additional Notes:</u>
Request for additional loan using 2ⁿᵈ mortgage on personal residence.

### Interest Rate Shock Analysis – Loan 1



| Annual pmt | | | | | | $57,650 | $59,050 | $60,471 | $61,912 | $63,373 |
|---|---|---|---|---|---|---|---|---|---|---|

### Interest Rate Shock Analysis – Loan 2, Fixed Rate



| Annual pmt | | | | | | $5,750 | $6,750 | $7,750 | $8,750 | $9,750 |
|---|---|---|---|---|---|---|---|---|---|---|

### Market Fluctuation Analysis



| LTV | 73% | 62% | 55% | 49% | 44% | 40% | 36% | 34% | 31% |
|---|---|---|---|---|---|---|---|---|---|

**Chris Harris**

| | |
|---|---|
| **From:** | Brian Hobbs <brian@gardenpartyflowershop.com> |
| **Sent:** | Thursday, December 12, 2019 10:35 AM |
| **To:** | Chris Harris |
| **Subject:** | Re: First national bank and trust docs |

Hey Chris -

I have the payoff letter from RCB - do you want me to scan it over to you now or I can just bring it tomorrow - let me know what you prefer and when you want me there.

Brian

On Dec 10, 2019, at 1:56 PM, Chris Harris <charris@fnbwford.com> wrote:

Brian,

I received the tax transcripts back today so go ahead and order the loan payoff for Monday, December 16th. Make sure they include a Per Diem (Daily Interest) with the loan payoff. We're on track for a Friday loan closing. Let me know if you have any questions.

Thank you,

Chris Harris
Regional Manager
Senior Vice President

First National Bank & Trust Company of Weatherford
4611 W. 6th Ave
Stillwater, OK 74074
P: (405) 533-3737
F: (405) 533-3805
NMLS ID: 675655

<image001.jpg>

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any retention, dissemination, distribution, or copying the communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately and delete the email from your system.

**From:** Brian Hobbs <brian@gardenpartyflowershop.com>
**Sent:** Monday, December 09, 2019 9:43 AM
**To:** Chris Harris <charris@fnbwford.com>
**Subject:** Re: First national bank and trust docs

1

EXHIBIT G

Hey Chris -

Hope you had a good weekend - I have the cc statements ready for you - I'll get the payoff info for you - when should I request it for?

Brian

On Dec 5, 2019, at 8:47 AM, Chris Harris <charris@fnbwford.com> wrote:

Which place has most of the collateral?  The warehouse?  If so, is it the building behind Firehouse Subs?

Chris Harris
Regional Manager
Senior Vice President

First National Bank & Trust Company of Weatherford
4611 W. 6th Ave
Stillwater, OK 74074
P: (405) 533-3737
F: (405) 533-3805
NMLS ID: 675655

<image001.jpg>

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any retention, dissemination, distribution, or copying the communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately and delete the email from your system.

**From:** Brian Hobbs <brian@gardenpartyflowershop.com>
**Sent:** Thursday, December 05, 2019 8:22 AM
**To:** Chris Harris <charris@fnbwford.com>
**Subject:** Re: First national bank and trust docs

Yep.  2 works for me - would you like to meet at the shop or warehouse?

Sent from my iPhone

On Dec 5, 2019, at 7:45 AM, Chris Harris <charris@fnbwford.com> wrote:

Are you available about 2PM today? I just need to look around at the collateral and take some pictures for the file. It shouldn't take very long.

Thank you,

Chris Harris
Regional Manager
Senior Vice President

First National Bank & Trust Company of Weatherford
4611 W. 6th Ave
Stillwater, OK 74074
P: (405) 533-3737
F: (405) 533-3805
NMLS ID: 675655

<image001.jpg>

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any retention, dissemination, distribution, or copying the communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately and delete the email from your system.

**From:** Brian Hobbs <brian@gardenpartyflowershop.com>
**Sent:** Wednesday, December 04, 2019 4:15 PM
**To:** Chris Harris <charris@fnbwford.com>
**Subject:** Re: First national bank and trust docs

Hey Chris - awesome - yeah was in touch with her and we'll take care of that tomorrow. Mark mentioned that you needed to come take some photos - do you want to set up a time tomorrow to do that? We can meet at the warehouse or the shop. Don't know what all you need. I can make myself available pretty much anytime - just let me know what works for you - thanks - Brian

Sent from my iPhone

On Dec 4, 2019, at 3:53 PM, Chris Harris <charris@fnbwford.com> wrote:

Brian,

3

I think I have everything I need to get started initially. You might start gathering the credit card statements for the cards we are refinancing. Cecily will be contacting you regarding the deposit accounts.

Thank you,

Chris Harris
Regional Manager
Senior Vice President

First National Bank & Trust Company of Weatherford
4611 W. 6th Ave
Stillwater, OK 74074
P: (405) 533-3737
F: (405) 533-3805
NMLS ID: 675655

<image001.jpg>

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any retention, dissemination, distribution, or copying the communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately and delete the email from your system.

From: Brian Hobbs
<brian@gardenpartyflowershop.com>
Sent: Wednesday, December 04, 2019 8:46 AM
To: Chris Harris <charris@fnbwford.com>
Subject: First national bank and trust docs

ATTENTION: This email came from an external source. Do not open attachments or click on links from unknown senders or unexpected emails.

With these you should have everything - please let me know you receive everything and if I missed anything
Thanks Chris

Brian



**RCB**
**BANK**

*That's my bank!*

## Payoff Request

| | |
|---|---|
| Date: | 12/11/19 |
| To: | RCB Bank |
| Attn: | Kristy D Werner |
| Fax: | |

| | |
|---|---|
| Re: | True Colours Inc |
| LOAN: | 2921781 |
| LEGAL: | All Inventory, Chattel Paper, Accounts, Equipment and GI |

| | |
|---|---|
| Balance: | $189,280.81 |
| Interest: | $1,198.77 |
| Memo Post Amount | |
| Late Charges | |
| Payoff Fee: | |
| **Total** | $190,479.58 |

**Please Add    $31.55    PERDAY**
***payoffs only given as of today's date, please add per deim accordingly***

**Upon receiving the correct payoff, all RCB Bank liens will be released.**
**Liens and Mortgages and Assignement of Rents will be released.**
**If this loan is a line of credit - our Borrower must send a written**
**request for the loan to be closed.**

RCB BANK
*Jamie D Colbert*
918.342.7114
918.342.7160 Fax

Overnight Address:
300 W Patti Page Blvd
Claremore, OK 74017

Address:
PO Box 189
Claremore, OK 74018

EXHIBIT _____ H



FIRST NATIONAL BANK AND
TRUST CO. OF WEATHERFORD
580-772-5574
Weatherford, Cordell, Hinton, Montesor & Bessie  FDIC
Oklahoma

403339

0055

**REMITTER**
TRUE COLOURS, INC. / LOAN PROCEEDS

86-120/1031

DATE    December 16, 2019

**PAY TO THE ORDER OF**    RCB

*190,479.58*

PAY
EXACTLY **$190,479** DOL **58** CTS

# CASHIER'S CHECK

COUNTERSIGNATURE REQUIRED OVER $10,000.00

Cecily Morris   Branch Manager

⑆403339⑆ ⑆103101204⑆    ⑆600 083⑆

EXHIBIT _I_



ptc # 55

FIRST NATIONAL BANK AND
TRUST CO. OF WEATHERFORD
580-772-5575
Weatherford, Cordell, Hinton, Morrison & Sidwater  FDIC
Oklahoma

403341

0005

**REMITTER**
TRUE COLOURS, INC

86-120/1031

December 17, 2019

**PAYABLE TO**   CHASE CARD SERVICES  ACCT#4380540006750755

PAY EXACTLY 16,962 DOL 23c **NOT NEGOTIABLE**

FEE COLLECTED _____

## CASHIER'S CHECK

RATE PAID _____

DAILY TOTAL _____

LOAN PROCEEDS 99C0962

⑈403341⑈ ⑈103101204⑈ ⑈600 083⑈ 009

R
E
G
I
S
T
E
R

C
O
P
Y

EXHIBIT ___I___

#5552562
ID - Memo: LOAN PROCEEDS 5552562
Serial #: 403341
0005 SH13 0055 H7
0005715171 2019-12-1
Sell.C. 16,962.89

>103101204<
FNB Weatherford #005
2019-12-17
0005715171
Batch 74682606

fil #55

FIRST NATIONAL BANK AND
TRUST CO. OF WEATHERFORD
580-772-5573
Weatherford, Cordell, Hinton, Manson & Stilwater FDIC
Oklahoma

403340

0005

REMITTER
THE COLOURS, INC

December 17, 2019

86-120/1031

AMERICAN EXPRESS 9-Y3008

*22,820.51*

PAYABLE TO

PAY *$22,820dol 51* NOT NEGOTIABLE

FEE COLLECTED _____

**CASHIER'S CHECK**

DATE PAID

LOAN PROCEEDS 0005821

DAILY TOTAL _____

⑈403340⑈  ⑆103101204⑆  ⑈600 083⑈  009

R
E
G
I
S
T
E
R

C
O
P
Y

EXHIBIT ___I___

SellC.C. 22,820.55

0005715170 2019-12

0005 SHT3 0055 H6

Serial #: 403340

ID - Memo: LOAN PROCEEDS 5552562

#5552562

>103101204<
FNB Weatherford #005
2019-12-17
0005715170
Batch 74682606

Job # 55

**FIRST** FIRST NATIONAL BANK AND
TRUST CO. OF WEATHERFORD
580-772-5575
Weatherford, Cordell, Hinton, Momson & Stilwater FDIC
Oklahoma

**403342**

0058

REMITTER
TRUE COLOURS, INC

86-120/1031

December 17, 2019

*11,281.96

PAYABLE TO     CHASE CARD SERVICES ACCT# 552475400084931

PAY ***11,281DOL 96CT NOT NEGOTIABLE**

FEE COLLECTED _____

**CASHIER'S CHECK**

DATE PAID _____

DAILY TOTAL _____

LOAN PROCEEDS 5056562

⑈403342⑈ ⑈103101204⑈  ⑈600 083⑈    009

R
E
G
I
S
T
E
R

C
O
P
Y

EXHIBIT ___I___

>103101204<
FNB Weatherford #005
2019-12-17
0005715172
Batch 74682606

pcl#55

**FIRST NATIONAL BANK AND TRUST CO. OF WEATHERFORD**
580-772-5575
Weatherford, Cordell, Hinton, Morrison & Stillwater FDIC
Oklahoma

403343

0050

REMITTER
TRUE COLOURS, INC

86-120/1031

December 17, 2019

$1,675.00

PAYABLE TO
CITI CARDS #5486

EXACTLY $1,675 DOL 00c **NOT NEGOTIABLE**

FEE COLLECTED _____

## CASHIER'S CHECK

DATE PAID

LOAN PROCEEDS 5551562

DAILY TOTAL _____

⑈403343⑈ ⑆103101204⑆  ⑈600 083⑈  009

R
E
G
I
S
T
E
R

C
O
P
Y

EXHIBIT ___I___

#5552562
ID - Memo: LOAN PROCEEDS 5552562
Serial #: 403343
0005 SHT3 0055 #9
12/17/2019 08:22:04 AM
0005715173 2019-12-17 Stillwater West
SellC.C. 4,675.04

>103101204<
FNB Weatherford #005
2019-12-17
0005715173
Batch 74682606

## DISBURSEMENT REQUEST AND AUTHORIZATION

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $250,000.00 | 12-13-2019 | 12-13-2024 | 5552562 | 08 | 45-4759306 | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** True Colours, Inc. (TIN: 46-4759306)
602 S Main St
Stillwater, OK 74074

**Lender:** First National Bank & Trust Co of Weatherford
STILLWATER WEST BRANCH
4611 W 6TH AVE
STILLWATER, OK 74074
(406) 533-3737

**LOAN TYPE.** This is a Fixed Rate (5.750%) Nondisclosable Loan to a Corporation for $250,000.00 due on demand and, if no demand, on December 13. 2024.

**PRIMARY PURPOSE OF LOAN.** The primary purpose of this loan is for:

☐ Personal, Family, or Household Purposes or Personal Investment.

☒ Business (including Real Estate Investment).

**SPECIFIC PURPOSE.** The specific purpose of this loan is:  SBA Express (50% Guarantee) Installment Note to refinance RCB Note and Credit Cards.

**DISBURSEMENT INSTRUCTIONS.** Borrower understands that no loan proceeds will be disbursed until all of Lender's conditions for making the loan have been satisfied. Please disburse the loan proceeds of $250,000.00 as follows:

Amount paid on Borrower's account:
$190,479.58 Payment on Loan # Cashier's Check to RCB                $190,479.58

Amount paid to others on Borrower's behalf:
$22,820.55 to Cashier's Check to American Express *9-73008          $55,740.42
$16,962.89 to Cashier's Check to Chase Card Services Acct#
4388540066353755
$11,281.94 to Cashier's Check to Chase Card Services Acct#
5524754000869931
$4,675.04 to Cashier's Check to Citi Cards *3486

Other Charges Financed:
$30.00  UCC Recording Fee                                           $3,780.00
$3,750.00  SBA Guaranty Fee

Note Principal:                                                     $250,000.00

**FINANCIAL CONDITION.**  BY SIGNING THIS AUTHORIZATION, BORROWER REPRESENTS AND WARRANTS TO LENDER THAT THE INFORMATION PROVIDED ABOVE IS TRUE AND CORRECT AND THAT THERE HAS BEEN NO MATERIAL ADVERSE CHANGE IN BORROWER'S FINANCIAL CONDITION AS DISCLOSED IN BORROWER'S MOST RECENT FINANCIAL STATEMENT TO LENDER.  THIS AUTHORIZATION IS DATED DECEMBER 13, 2019.

**BORROWER:**

TRUE COLOURS, INC.

By: _____
Brian Matthew Hobbs, President of True Colours,
Inc.

LaserPro, Ver. 19.2.0.042  Copr. Finastra USA Corporation 1997  2019.  All Rights Reserved.  - OK  L:\PRO\SUITE\CFN\PL\I20.FC  TR-2017  PR-COMM (DC)

EXHIBIT ___I___

## First National Bank Borrowing Base Certificate

Borrower: True Colours, Inc                    Date: 12/15/19

Complete the following information from the most recent Accounts Receivable Aging Summary and/or Balance Sheet (both reports must be within the past 30 days).

Accounts Receivable Aging Summary Date: 12/15/19

| | |
|---|---|
| Total Accounts Receivable | 59,680 |
| LESS: Ineligible Amounts (Amounts over 90 days past due) | 0 |
| Total Eligible Accounts Receivable | 59,680 |
| Advance Rate | 75% |
| Total Margined Receivables Amount | 44,760 |

Inventory Summary Valuation Date: 12/15/19

| | |
|---|---|
| Total Inventory Amount | 560,004 |
| Advance Rate | 75% |
| Total Margined Inventory Amount | 470,003 |

| | |
|---|---|
| Available Borrowing Base | 464,763 |
| LESS: Current Loan Balance | |
| Available Funds (Payment Due) | |

For purposes of securing credit from First National Bank & Trust Company, I hereby certify that the above information is true and correct in all material respects. This certificate is made and given in compliance with Loan Agreement dated 12/13/19.

By: _(signature)_                    Date: 12/15/19

Title: PRESIDENT

EXHIBIT    J

1

# *CAIVRS Prescreening*

| **Business Background** | **Steps for Processing** | **Field Descriptions** |
|---|---|---|

✓ *Message:* **CAIVRS AUTHORIZATION SUCCESSFULLY COMPLETED**
SUCCESS

| *Borrower TIN* | **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** | *Authorization Number:* | **A337395412** |
|---|---|---|---|
| *Agency Name* | *Case Number* | *Case Type* | *Phone Referral* |

| *Coborrower 1 SSN* | **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** | *Authorization Number:* | **A337569976** |
|---|---|---|---|
| *Agency Name* | *Case Number* | *Case Type* | *Phone Referral* |

| *Coborrower 2 N/A* | | *Authorization Number:* |
|---|---|---|
| *Coborrower 3 N/A* | | *Authorization Number:* |
| *Coborrower 4 N/A* | | *Authorization Number:* |

CAIVRS Home   New Request

*Comments or Need Assistance* <CAIVRS Administration>

EXHIBIT ___K___

GARDEN PARTY

## Asset Detail Oct 1, 2019

| PROPERTY DESCRIPTION | AMMOUNT COST |
|---|---|
| OFFICE EQUIPMENT FIXTURES, FURNITURE, 502 S MAIN AND 520 W 6TH | $64,644.37 |
| ELECTRONICS | $23,000.00 |
| 2015 HONDA ODESSEY | $16,350.00 |
| EVENT CHAIRS | $215,500.00 |
| EVENT TABLES | $47,500.00 |
| EVENT SILVERWARE | $12,000.00 |
| EVENT STEMWARE | $1,367.00 |
| EVENT CHINA | $14,800.00 |
| EVENT DECOR | $77,750.00 |
| EVENT LINENS | $73,500.00 |
| EVENT FURNITURE | $18,915.00 |
| EVENT FIXTURES | $55,000.00 |
| EVENT EQUIPMENT | $19,500.00 |
| EVENT MISCELLANEOUS | $3,100.00 |
| 2016 CHEVY EXPRESS G35 | $33,980.00 |
| EVENT RENTAL SIGNS | $2,451.25 |
| MIELE ROTARY PRESS | $13,750.00 |
| SHOWROOM FURNITURE | $79,342.50 |
| SHOWROOM INVENTORY | $83,800.00 |
| CADILLAC ESCALADE | $83,795.00 |
| RAM PROMASTER | $27,630.00 |
| | $967,675.12 |

100582 True Colours, Inc.
45-4759306
FYE: 12/31/2018

**Tax Asset Detail    1/01/18 - 12/31/18**

06/14/2019  11:01 AM
Page 1

| Asset # | d/t | Property Description | Date In Service | Tax Cost | Sec 179 Exp Current = c | Tax Bonus Amt | Tax Prior Depreciation | Tax Current Depreciation | Tax End Depr | Tax Net Book Value | Tax Method | Tax Period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Group: | | | | | | | | | | | | |
| 1 | | OFFICE FURNITURE | 9/01/14 | 5,002.00 | 0.00 | 2,501.00 | 4,220.66 | 223.24 | 4,443.90 | 558.10 | 200DB | 7.0 |
| 2 | | COMPUTERS | 9/01/14 | 3,500.00 | 0.00 | 1,750.00 | 3,197.60 | 201.60 | 3,399.20 | 100.80 | 200DB | 5.0 |
| 3 | | WORK AREA FURNITURE | 9/01/14 | 570.00 | 0.00 | 285.00 | 481.08 | 25.41 | 506.49 | 63.51 | 200DB | 7.0 |
| 4 | | DISPLAY PIECES | 9/01/14 | 1,965.00 | 0.00 | 982.50 | 1,658.15 | 87.67 | 1,745.82 | 219.18 | 200DB | 7.0 |
| 5 | | TELEPHONE SYSTEM | 9/01/14 | 226.00 | 0.00 | 113.00 | 190.65 | 10.10 | 200.75 | 25.25 | 200DB | 7.0 |
| 6 | | COPIER | 9/01/14 | 248.00 | 0.00 | 124.00 | 209.37 | 11.04 | 220.41 | 27.59 | 200DB | 7.0 |
| 7 | | TELEVISION | 9/01/14 | 487.00 | 0.00 | 243.50 | 411.20 | 21.66 | 432.86 | 54.14 | 200DB | 7.0 |
| 8 | | CARPET | 9/01/14 | 136.00 | 0.00 | 68.00 | 114.86 | 6.04 | 120.90 | 15.10 | 200DB | 7.0 |
| 9 | | GLASS | 9/01/14 | 64.00 | 0.00 | 32.00 | 54.16 | 2.81 | 56.97 | 7.03 | 200DB | 7.0 |
| 10 | | SHELVING | 9/01/14 | 1,555.00 | 0.00 | 777.50 | 1,312.29 | 69.35 | 1,381.64 | 173.36 | 200DB | 7.0 |
| 11 | | PAINTING | 9/01/14 | 1,793.00 | 0.00 | 896.50 | 1,172.62 | 62.04 | 1,234.66 | 558.34 | 150DB | 15.0 |
| 12 | | ADT SECURITY SYSTEM | 9/01/14 | 759.00 | 0.00 | 379.50 | 496.56 | 26.24 | 522.80 | 236.20 | 150DB | 15.0 |
| 13 | | COOLER | 9/01/14 | 13,018.00 | 0.00 | 6,509.00 | 8,509.86 | 450.81 | 8,960.67 | 4,057.33 | 150DB | 15.0 |
| 14 | | WINDOW TREATMENTS | 9/01/14 | 4,803.00 | 0.00 | 2,401.50 | 3,140.15 | 166.29 | 3,306.44 | 1,496.56 | 150DB | 15.0 |
| 15 | | SPEAKERS | 9/01/14 | 871.00 | 0.00 | 435.50 | 569.92 | 30.11 | 600.03 | 270.97 | 150DB | 15.0 |
| 16 | | LIGHTING | 9/01/14 | 2,386.00 | 0.00 | 1,193.00 | 1,560.04 | 82.60 | 1,642.64 | 743.36 | 150DB | 15.0 |
| 17 | | FLOORING | 9/01/14 | 4,696.00 | 0.00 | 2,348.00 | 3,069.60 | 162.64 | 3,232.24 | 1,463.76 | 150DB | 15.0 |
| 18 | | WORK BENCHES | 9/01/14 | 2,567.00 | 0.00 | 1,283.50 | 1,678.35 | 88.87 | 1,767.22 | 799.78 | 150DB | 15.0 |
| 19 | | BATHROOM RENOVATION | 9/01/14 | 3,406.00 | 0.00 | 1,703.00 | 1,672.75 | 83.33 | 1,656.08 | 749.92 | 150DB | 15.0 |
| 20 | | MANTLE | 9/01/14 | 366.00 | 0.00 | 183.00 | 239.15 | 12.69 | 251.84 | 114.16 | 150DB | 15.0 |
| 21 | | SIGNAGE | 9/01/14 | 2,500.00 | 0.00 | 1,250.00 | 1,634.68 | 86.53 | 1,721.21 | 778.79 | 150DB | 15.0 |
| 22 | | ARCHITECT FEES | 9/01/14 | 31,489.00 | 0.00 | 15,466.00 | 22,285.00 | 1,975.00 | 24,260.00 | 7,229.00 | 200DB | 5.0 |
| 23 | | HONDA | 9/01/14 | 1,000.00 | 0.00 | 500.00 | 843.66 | 44.67 | 888.33 | 111.67 | 200DB | 7.0 |
| 24 | | EVENT CHAIRS | 6/01/16 | 68,000.00 | 0.00 | 34,000.00 | 47,183.67 | 5,947.52 | 53,131.19 | 14,868.81 | 200DB | 7.0 |
| 25 | | EVENT TABLES | 6/01/16 | 11,500.00 | 0.00 | 5,750.00 | 7,979.59 | 1,005.83 | 8,985.42 | 2,514.58 | 200DB | 7.0 |
| 26 | d | EVENT SILVERWARE | 6/01/16 | 14,000.00 | 0.00 | 7,000.00 | 9,714.29 | 612.24 | 10,326.53 | 3,673.47 | 200DB | 7.0 |
| 27 | d | EVENT STEMWARE | 6/01/16 | 7,000.00 | 0.00 | 3,500.00 | 4,857.14 | 306.12 | 5,163.26 | 1,836.74 | 200DB | 7.0 |
| 28 | d | EVENT CHINA | 6/01/16 | 15,000.00 | 0.00 | 7,500.00 | 10,408.16 | 655.98 | 11,064.14 | 3,935.86 | 200DB | 7.0 |
| 29 | d | EVENT DECOR | 6/01/16 | 17,000.00 | 0.00 | 8,500.00 | 11,795.92 | 743.44 | 12,539.36 | 4,460.64 | 200DB | 7.0 |
| 30 | d | EVENT LINENS | 6/01/16 | 10,000.00 | 0.00 | 5,000.00 | 6,938.78 | 437.32 | 7,376.10 | 2,623.90 | 200DB | 7.0 |
| 31 | | EVENT FURNITURE | 6/01/16 | 57,000.00 | 0.00 | 28,500.00 | 39,551.02 | 4,985.42 | 44,536.44 | 12,463.56 | 200DB | 7.0 |
| 32 | d | EVENT FIXTURES | 6/01/16 | 5,500.00 | 0.00 | 2,750.00 | 3,816.33 | 240.52 | 4,056.85 | 1,443.15 | 200DB | 7.0 |
| 33 | | EVENT EQUIPMENT | 6/01/16 | 4,801.00 | 0.00 | 2,400.50 | 3,648.76 | 460.90 | 4,109.66 | 691.34 | 200DB | 5.0 |
| 34 | d | EVENT MISCELLANEOUS | 6/01/16 | 2,436.00 | 0.00 | 1,218.00 | 1,690.29 | 106.53 | 1,796.82 | 639.18 | 200DB | 7.0 |
| 35 | | 2016 CHEVROLET EXPRESS G3... | 6/01/16 | 41,905.50 | 0.00 | 11,560.00 | 17,260.00 | 5,250.00 | 26,510.00 | 21,395.50 | 200DB | 5.0 |
| 36 | | EVENT RENTAL SIGNS | 6/01/16 | 2,682.70 | 0.00 | 1,341.35 | 1,535.85 | 114.69 | 1,650.54 | 1,032.16 | 150DB | 15.0 |
| 37 | | EVENT RENTAL PAINTING | 6/01/16 | 1,500.00 | 0.00 | 750.00 | 858.75 | 64.13 | 922.88 | 577.12 | 150DB | 15.0 |
| 38 | | EVENT RENTAL HEATING & CO | 6/01/16 | 1,017.58 | 0.00 | 508.79 | 582.57 | 43.50 | 626.07 | 391.51 | 150DB | 15.0 |
| 39 | | EVENT RENTAL PLUMBING | 6/01/16 | 1,019.22 | 0.00 | 509.61 | 583.50 | 43.57 | 627.07 | 392.15 | 150DB | 15.0 |
| 40 | | CADILLAC ESCALADE | 7/06/17 | 104,385.00 | 0.00 | 52,192.50 | 52,631.00 | 16,201.60 | 79,333.60 | 25,052.40 | 200DB | 5.0 |
| 41 | | EVENT CHAIRS | 5/11/17 | 27,200.00 | 0.00 | 13,600.00 | 15,542.86 | 3,330.61 | 18,873.47 | 8,326.53 | 200DB | 7.0 |
| 42 | | EVENT TABLES | 5/11/17 | 27,000.00 | 0.00 | 13,500.00 | 15,428.57 | 3,306.12 | 18,734.69 | 8,265.31 | 200DB | 7.0 |
| 43 | | EVENT STEMWARE | 5/11/17 | 10,120.00 | 0.00 | 5,060.00 | 5,782.86 | 619.59 | 6,402.45 | 3,717.55 | 200DB | 7.0 |
| 44 | d | EVENT DECOR | 5/11/17 | 36,316.00 | 0.00 | 18,158.00 | 20,752.00 | 2,223.43 | 22,975.43 | 13,340.57 | 200DB | 7.0 |
| 45 | d | EVENT FIXTURES | 5/11/17 | 1,700.00 | 0.00 | 850.00 | 971.43 | 104.08 | 1,075.51 | 624.49 | 200DB | 7.0 |
| 46 | d | EVENT LINENS | 11/13/17 | 20,500.00 | 0.00 | 20,500.00 | 20,500.00 | 0.00 | 20,500.00 | 0.00 | 200DB | 7.0 |
| 47 | d | EVENT EQUIPMENT | 11/13/17 | 24,639.00 | 0.00 | 24,639.00 | 24,639.00 | 0.00 | 24,639.00 | 0.00 | 200DB | 7.0 |
| 48 | d | EVENT MISCELLANEOUS | 11/13/17 | 1,294.00 | 0.00 | 1,294.00 | 1,294.00 | 0.00 | 1,294.00 | 0.00 | 200DB | 7.0 |
| 49 | d | MIELE ROTARY PRESS (2) | 11/13/17 | 26,366.00 | 0.00 | 26,366.00 | 26,366.00 | 0.00 | 26,366.00 | 0.00 | 200DB | 7.0 |

100582  True Colours, Inc.
45-4759306
FYE: 12/31/2018

### Tax Asset Detail   1/01/18 - 12/31/18

06/14/2019  11:01 AM
Page 2

| Asset | d t | Property Description | Date In Service | Tax Cost | Sec 179 Exp Current = c | Tax Bonus Amt | Tax Prior Depreciation | Tax Current Depreciation | Tax End Depr | Tax Net Book Value | Tax Method | Tax Period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Group:** (continued) | | | | | | | | | | | | |
| 50 | | SHOWROOM FURNITURE | 6/01/17 | 85,403.00 | 0.00 | 42,701.50 | 48,801.71 | 10,457.51 | 59,259.22 | 26,143.78 | 200DB | 7.0 |
| 51 | | MIELE ROTARY PRESS (I) | 11/13/17 | 13,183.00 | 0.00 | 6,591.50 | 13,183.00 | 0.00 | 13,183.00 | 0.00 | 200DB | 7.0 |
| 52 | | 2014 DODGE VAN | 6/30/18 | 31,000.00 | 0.00 | 31,000.00 | 0.00 | 31,000.00 | 31,000.00 | 0.00 | 200DB | 5.0 |
| | | No Group | | 751,875.00 | 0.00c | 414,159.75 | 482,919.41 | | 573,710.80 | 178,164.20 | | |
| | | *Less: Dispositions and Transfers | | 191,871.00 | 0.00 | 0.00 | 149,526.20 | 90,791.39 | 155,575.45 | 36,295.55 | | |
| | | Net No Group | | 560,004.00 | 0.00c | 414,159.75 | 333,393.21 | 90,791.39 | 418,135.35 | 141,868.65 | | |
| | | Grand Total | | 751,875.00 | 0.00c | 414,159.75 | 482,919.41 | | 573,710.80 | 178,164.20 | | |
| | | Less: Dispositions and Transfers | | 191,871.00 | 0.00 | 0.00 | 149,526.20 | 90,791.39 | 155,575.45 | 36,295.55 | | |
| | | Net Grand Total | | 560,004.00 | 0.00c | 414,159.75 | 333,393.21 | 90,791.39 | 418,135.35 | 141,868.65 | | |

*CH approved 2/6/20*

## FIRST MONEY LINE APPLICATION

IMPORTANT: Read these Directions before completing this Application. Check the Appropriate Box.

- If you are applying for individual credit in an individual account, in your own name, and are relying on your own income or assets and relying on the income or assets of another person as the basis for repayment of the credit requested, complete only Sections A-D.

- If you are applying for joint credit with another person or for a joint account or an account that you and another person will use, complete all Sections, providing information in Section E about the joint applicant.

  We intend to apply for joint credit.    Applicant ____    Co-Applicant ____

- If you are applying for individual credit or an individual account, but are relying on income from alimony, child support or separate maintenance or on the income or assets of another person as the basis for repayment of the credit requested, complete all Sections to the extent possible, providing information in Section E about the person on whose alimony, support or maintenance payments or income or assets you are relying.

### SECTION A - APPLICANT

| NAME (Please print full name) Brian M. Hobbs | HOME PHONE | CELL PHONE | CHECKING ACCOUNT NUMBER 51004144 | AMOUNT OF FIRST MONEY LINE REQUESTED $5,000.00 |
|---|---|---|---|---|
| PRESENT STREET | | HOW LONG AT THIS ADDRESS | | |
| CITY, STATE AND ZIP | | E-MAIL ADDRESS | | |
| IMMEDIATE PREVIOUS ADDRESS | | HOW LONG AT THIS ADDRESS | | |
| CITY AND STATE | | ZIP | | |

| SOCIAL SECURITY NUMBER ***-**-**** | DRIVERS LICENSE NUMBER - STATE | BIRTH DATE | NO. OF DEPENDENTS - LIST BY AGE | ARE YOU A U.S. CITIZEN? ☐ YES    ☐ NO |

NAME, ADDRESS AND RELATIONSHIP OF TWO NEAREST RELATIVES NOT LIVING WITH YOU OTHER THAN A PRESENT OR FORMER SPOUSE

| MY PRINCIPAL FINANCIAL INSTITUTION IS    Services presently used    No | ☒ Checking Account    No | ☐ Savings Account | ☐ Safe Deposit  ☒ Loan ☐ Cert. of Deposit | OTHER FINANCIAL INSTITUTIONS USED |

### SECTION B - INCOME AND EMPLOYMENT

| PRESENT EMPLOYER True Colours, Inc. | | SALARY AND WAGES $S in BM | MONTHLY INCOME |
|---|---|---|---|
| EMPLOYER ADDRESS | BUSINESS PHONE | OTHER INCOME - From Whom or Describe (Alimony, child support or separate maintenance income need not be revealed if you do not wish to have it considered as a basis for repaying this obligation) | |
| POSITION OR TITLE Owner | DATE OF EMPLOY | | |
| PREVIOUS EMPLOYER AND ADDRESS | | | |
| POSITION OR TITLE | YEARS EMPLOYED | | TOTAL MONTHLY INCOME |

If you have chosen to disclose income from alimony, child support or separate maintenance is such income pursuant to
☐ Written Agreement    ☐ Court Decree    ☐ Other

| | | HOW LONG RECEIVED | HOW OFTEN | FROM WHOM |

### SECTION D - LIABILITIES AND INDEBTEDNESS

List below all indebtedness to banks, credit unions, stores, finance companies, individuals and other creditors, including obligations to pay alimony, child support, separate maintenance, rent, mortgages, etc.

| CREDITOR | TYPE OF DEBT OR ACCOUNT NUMBER | ORIGINAL DEBT (omit rent) | PRESENT AMOUNT OWED (omit rent) | COLLATERAL | MONTHLY PAYMENT |
|---|---|---|---|---|---|
| LANDLORD OR MORTGAGE HOLDER | ☐ Rent Payment ☐ Mortgage | | | | |
| | | | | | |
| | | | | | |
| CREDIT CARDS | | | | | |
| | | | | | |
| | | | LIABILITIES | | MONTHLY PAYMENTS |

| Totals | | | | | |

| Have you ever been bankrupt or had any judgments or garnishments against you? ☐ NO  ☐ YES- WHEN? | MONTHLY DEBT TO INCOME    % | ASSETS TO LIABILITIES    % |

### SECTION E - JOINT APPLICANT, USER OR OTHER PARTY (Use separate sheets, if needed.)

If this Section of Application is completed, the indebtedness of Co-Applicant/Guarantor/Endorser must be shown under the "Liabilities and Indebtedness" Section above. (Alimony, child support or separate maintenance income need not be revealed if you do not wish to have it considered as a basis for repaying this obligation)

| NAME AND RELATIONSHIP TO APPLICANT | ADDRESS | | ☐ CO-APPLICANT ☐ GUARANTOR  ☐ ENDORSER |
|---|---|---|---|
| EMPLOYED BY | HOW LONG | POSITION OR TITLE | BUSINESS PHONE | HOME PHONE | SOCIAL SECURITY NUMBER | BIRTH DATE |
| MONTHLY INCOME | OTHER INCOME | | | TOTAL INCOME $ | DRIVERS LICENSE NUMBER - STATE |

NAME, ADDRESS AND RELATIONSHIP OF TWO NEAREST RELATIVES NOT LIVING WITH YOU OTHER THAN A PRESENT OR FORMER SPOUSE

| | | | | ARE YOU A U.S. CITIZEN ☐ Yes    ☐ No |
| MY PRINCIPAL FINANCIAL INSTITUTION IS    Services presently used    No | ☐ Checking Account    No | ☐ Savings Account | ☐ Safe Deposit  ☐ Loan ☐ Cert. of Deposit | OTHER FINANCIAL INSTITUTIONS USED |

### SIGNATURES

Everything that I have stated in this application is correct to the best of my knowledge. I understand that you will retain this application whether or not loan is approved. You are authorized to check my credit and employment history and to answer questions about my credit experience with me.

| APPLICANT'S SIGNATURE | DATE | CO-APPLICANT/GUARANTOR/ENDORSER SIGNATURE (Where Applicable) | DATE |
|---|---|---|---|
| X *[signature]* | 2/5/20 | X | |

EXHIBIT *L*

*CM 2-6-2020*